UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUDGE LEINENWEBER

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 10CR 0196 |
| v. | Violation: Title 18, United States Code, Sections 1001, 1341, and 2 |
| RUDOLPH CARMEN FRATTO, also known as "The Chin" and "Uncle Rudy," and WILLIAM ANTHONY DEGIRONEMO, also known as "Billy D" | MAGISTRATE JUDGE VALDEZ UNDER SEAL |

FILED
3-11-10
MAR 11 2010
MAGISTRATE JUDGE MARIA VALDEZ
UNITED STATES DISTRICT COURT

## COUNT ONE

The SPECIAL JANUARY 2009 GRAND JURY charges:

1. At times material to this Indictment:

    (a) McCormick Place Convention Center was a Chicago, Illinois, venue for trade shows and expositions, including the International Machine and Tool Show ("IMTS") and the National Plastics Exposition ("NPE").

    (b) Greyhound Exposition Services ("GES") was a general contractor, headquartered in Las Vegas, Nevada, in the business of staging trade shows and expositions in Chicago, Illinois, and elsewhere, including at McCormick Place Convention Center. GES's clients included the IMTS and the NPE.

    (c) GES required that all employees and contractors review, sign, and abide by GES's "Always Honest" confidentiality policy, which prohibited employees and contractors from engaging in conduct that interfered with, or appeared to interfere with, their duty of loyalty to GES, and which required them to preserve the confidentiality of non-public information concerning GES.

(d) In or about 2001, Individual A started a trade show company in Chicago, Illinois ("Trade Show Company A"). Between in or about 2001 and 2002, individuals in Cleveland, Ohio, who were purportedly members of the Cleveland organized crime family, as well as a Chicago Attorney ("Individual B") (collectively hereinafter referred to as the "Investors") invested a total of approximately $350,000 in Trade Show Company A. At the time of the investment, Individual A did not understand the $350,000 to be a loan. In or about 2003, however, Trade Show Company A went out of business, and the Investors began to re-characterize the investment as a "loan," which they demanded Individual A "repay." Unbeknownst to the Investors, defendant FRATTO and defendant DEGIRONEMO, however, Individual A in or around January 2004 reported to law enforcement these attempts to "collect" on the "debt" Individual A purportedly owed the Investors, and began cooperating with law enforcement.

(e) Beginning on or about September 12, 2001, Individual A worked for GES pursuant to a Consultant Agreement that, among other things, precluded Individual A from disclosing confidential information he obtained as a result of his employment with GES, and from otherwise involving himself in the negotiations with potential bidders vying for subcontracts with GES.

(f) As a general contractor staging trade shows, GES was responsible for, among other things, securing forklifts used to set up and take down displays at these shows. GES secured forklift subcontracts from vendors for all of its shows, including the IMTS and NPE, following a standard confidential bidding process. As part of this process, each year GES issued a Request For Proposals ("RFP") to potential vendors, and informed them of the deadline for submitting their bids to provide forklifts for one or more trade shows staged by GES that year. The potential vendors receiving the RFP

thereafter completed Preferred Vendor Agreement Forms ("PVAFs," also known as the "bids"), which included terms governing the scope of service, information on the nature of the insurance held by the potential bidder, and the bidder's rates. GES requested that the bidders fax or mail the completed confidential PVAFs to GES's Chicago offices. Once a bidder's confidential PVAF was reviewed and approved by GES's Legal Department, GES notified the bidder that the bidder met GES's basic requirements.

(g) Individual A, along with three GES managers ("GES Manager A," "GES Manager B," and "GES Manager C"), were the decision makers responsible for awarding the GES forklift subcontracts for the IMTS and the NPE. Following the submission deadline for the confidential PVAFs, Individual A, GES Manager A, GES Manager B, and GES Manager C met in person to review and discuss the approved PVAFs, and to decide on the winning bidder. GES decided who to award the forklift subcontract to, and whether to subsequently issue to the winning bidder the Purchase Orders ("P.O.s") for forklift rentals for one or more shows after evaluating a combination of the bidders' PVAF rates, as well as the bidders' ability to perform on the subcontract. GES thereafter notified the winning bidder of GES's decision, and informed the winning bidder that GES at a later date would issue the P.O.s for the individual upcoming shows.

(h) MidStates Equipment Rentals and Sales, Inc. ("MidStates") was a company incorporated in Illinois. Defendant DEGIRONEMO was MidStates' registered President and Owner.

(i) Defendant FRATTO represented himself to be a member of the Chicago organized crime family, known as "The Chicago Outfit."

2. Beginning in or about July 2005, and continuing until in or about October

3

2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

> RUDOLPH CARMEN FRATTO,
> also known as "The Chin"
> and "Uncle Rudy," and
> WILLIAM ANTHONY DEGIRONEMO,
> also known as "Billy D,"

defendants herein, devised and intended to devise a scheme to defraud GES in order to obtain money and property from GES by means of false and fraudulent pretenses, representations, and promises, which scheme is further described below:

3. It was part of the scheme to defraud that between approximately July 2005 and October 2008, defendant FRATTO made representations to Individual A concerning FRATTO's standing and association with the Chicago Outfit, and promised to use his position with the Chicago Outfit to intercede on Individual A's behalf concerning an outstanding financial debt Individual A purportedly owed to the Investors. In return, Individual A was to provide defendants FRATTO and DEGIRONEMO with non-public bid information concerning bids GES received for the 2006 IMTS and NPE forklift subcontract, and to otherwise use his position with GES to help steer the 2006 IMTS and NPE forklift subcontracts to defendants FRATTO and DEGIRONEMO. In the attempt to thus obtain the subcontracts, defendant DEGIRONEMO made false and misleading representations to GES, and caused such false and misleading representations to be made to GES.

4. It was further part of the scheme that in or about July 2005, Individual A had a conversation with FRATTO in which FRATTO and Individual A discussed a "debt" that Individual A owed to the Investors. FRATTO indicated in sum and substance that if FRATTO and DEGIRONEMO could get the 2006 forklift subcontract with GES, then FRATTO would assist Individual A with his "debt to Cleveland."

4

5. It was further part of the scheme that defendants FRATTO and DEGIRONEMO agreed to split all profits and proceeds from the forklift subcontract between FRATTO, DEGIRONEMO, and Individual A, each receiving one-third of the proceeds, with FRATTO suggesting to Individual A that Individual A use his share of these proceeds to repay the "debt" he (Individual A) owed to the Investors.

6. It was further part of the scheme that defendants FRATTO and DEGIRONEMO in or around December 2005, and without the knowledge or consent of GES, received from Individual A non-public pricing information they had requested concerning Competitor A's confidential PVAF forklift rates.

7. It was further part of the scheme that on or about December 8, 2005, defendants FRATTO and DEGIRONEMO, who planned to use MidStates to submit a PVAF to secure the forklift subcontracts for the 2006 IMTS and NPE, knowing that Individual A would participate in the GES meeting during which GES would review the submitted confidential forklift PVAFs to decide on the winning PVAF, discussed with Individual A leaving the MidStates PVAF rate figures "blank" so that Individual A could fill them in during the course of this meeting.

8. It was further part of the scheme that in or about January 2006, defendants FRATTO and DEGIRONEMO used confidential Competitor A's information, which they obtained from Individual A to prepare their PVAF for the forklift subcontracts for the 2006 IMTS and NPE.

9. It was further part of the scheme that on or about January 15, 2006, defendants DEGIRONEMO and FRATTO caused MidStates to submit its PVAF to GES for the 2006 IMTS and NPE forklift subcontracts. The forklift rates MidStates submitted were lower than the rates in the competitors' PVAFs.

10. It was further part of the scheme that in or about January 2006, defendants FRATTO and DEGIRONEMO asked Individual A to help persuade GES's management to award MidStates the 2006 IMTS and NPE forklift subcontracts by, among other things, supporting MidStates' claim that it was a reliable and trustworthy forklift company.

11. It was further part of the scheme that on or about January 29, 2006, based in part on MidStates PVAF and Individual A's verbal support of MidStates, GES awarded to MidStates the forklift subcontracts for the 2006 IMTS and NPE.

12. It was further part of the scheme that in or about April of 2006, after GES requested additional verification of MidStates' ability to perform on the 2006 IMTS forklift subcontract, and prior to GES issuing the Purchase Order to MidStates, defendant DEGIRONEMO, through Individual B, caused employees of Company A, Company B, Company C, and Company D to write letters of reference to GES, falsely stating that MidStates in the past had provided various forklift services, and that those services were provided to the full satisfaction of Company A, Company B, Company C, and Company D, when, in fact, MidStates had never provided such services to Company A, Company B, Company C, or Company D.

13. It was further part of the scheme that on or about April 12, 2006, defendants DEGIRONEMO and FRATTO caused a list of false business references, as well as various false letters of reference, to be faxed to GES's Chicago offices.

14. It was further part of the scheme that, in or about April 2006, defendant DEGIRONEMO met with members of GES management to explain to them why they should issue the 2006 IMTS forklift Purchase Order to MidStates. DEGIRONEMO during this meeting provided GES management with flyers asserting that MidStates was

a "leader in the rental material handling industry for over twenty years," which "offer[ed] one of the most diverse fleets [of forklifts] in the industry," when MidStates during this time in fact was not actively involved in the forklift business.

15. It was further part of the scheme that on or about April 14, 2006, defendants FRATTO and DEGIRONEMO caused GES to send via FedEx to MidStates the MidStates PVAF for the 2006 IMTS and NPE forklift subcontracts, which, once signed, served as GES's formal awarding of the subcontracts to MidStates.

16. It was further a part of the scheme that to further the objects of the scheme, and continue the scheme without detection by law enforcement, GES, and others, defendants FRATTO and DEGIRONEMO misrepresented, concealed, and hid, and caused to be misrepresented, concealed and hidden, the existence of the scheme, as well as conduct and acts committed during and in furtherance of the scheme.

17. On or about April 14, 2006, in the Northern District of Illinois, Eastern Division, and elsewhere,

> RUDOLPH CARMEN FRATTO,
> also known as "The Chin"
> and "Uncle Rudy," and
> WILLIAM ANTHONY DEGIRONEMO,
> also known as "Billy D,"

defendants herein, for the purpose of executing the aforesaid scheme and attempting to do so, knowingly caused GES to send an envelope containing MidStates' PVAF to be delivered by Federal Express according to the directions thereon to:

> MidStates Equipment Rental + Sales, Inc.
> 1321 Tower Road
> Schaumburg, Illinois 60173

In violation of Title 18, United States Code, Sections 1341 and 2.

7

## COUNT TWO

The SPECIAL JANUARY 2009 GRAND JURY further charges:

On or about August 18, 2008, in the Northern District of Illinois, Eastern Division,

WILLIAM ANTHONY DEGIRONEMO,
also known as "Billy D,"

defendant herein, did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the Federal Bureau of Investigation ("FBI"), an agency within the executive branch of the Government of the United States, in that DEGIRONEMO stated that he (DEGIRONEMO):

> Had no idea what MidStates' competitors' forklift pricing was prior to submitting the MidStates bid for the IMTS forklift contract,

when, at the time DEGIRONEMO made this statement, DEGIRONEMO knew such statement and representation was false;

In violation of Title 18, United States Code, Section 1001(a)(2).

A TRUE BILL:

_____
UNITED STATES ATTORNEY